**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE:                                       )
SOUTH BEACH SECURITIES, INC.,   )        Case No. 05 C 5957
                                              )
              Debtor.                    )
                                              )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

South Beach Securities, Inc. filed a petition for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. The bankruptcy court dismissed the petition, finding that it had been filed in bad faith. South Beach has appealed the decision. For the reasons discussed below, the Court reverses and remands to the bankruptcy court.

### Facts

South Beach, a Mississippi corporation, is a wholly-owned subsidiary of NOLA, LLC (NOLA), an Illinois limited liability corporation. NOLA is owned by Leon Greenblatt II, Robert Jahelka, and James Nichols. Both companies filed bankruptcy petitions on April 27, 2005.

We briefly recount the dueling versions of how South Beach and NOLA came to file for bankruptcy protection.[1] We begin with South Beach's representation of the facts. Several years ago, South Beach obtained a $3,297,489 loan from Scattered Corporation, which is owned by the sons of NOLA's owners – Leon Greenblatt III, Andrew Jahelka, and Richard Nichols. R. Ex. 2.

---

[1] Only South Beach has appealed the dismissal of its bankruptcy petition. Nonetheless, because South Beach's and NOLA's financial dealings are intertwined, we discuss the circumstances that led both companies to file for bankruptcy protection.

In early 2001, South Beach lent the same amount – $3,297,489 – to NOLA for the purchase of stock in Health Risk Management, Inc. (HRM). By the middle of 2001, however, Ernst & Young – HRM's independent auditor – had notified the company that it could no longer certify HRM's 2000 year-end financial statement. Ernst & Young resigned as HRM's auditor, and NASDAQ halted trading in HRM stock, which became worthless. Because HRM stock represented one of NOLA's largest assets, NOLA could not repay South Beach, and South Beach, in turn, could not repay Scattered. As a result, NOLA and South Beach filed for bankruptcy protection. South Beach Mem. at 2-3. We note that South Beach did not provide the bankruptcy court any documentation regarding the loans from Scattered to South Beach or from South Beach to NOLA.

Wachovia Securities LLC, one of NOLA's creditors, provides an alternate account of South Beach's and NOLA's dealings.[2] According to Wachovia, the so-called financial travails of South Beach and NOLA were part of a fraudulent financial scheme orchestrated by Leon Greenblatt III (Greenblatt), one of the owners of Scattered. In an effort to take over HRM, Greenblatt used numerous shell corporations to buy up stock in the company. In the middle of 2000, he entered a standstill agreement with HRM that allowed him to place one of his associates on HRM's board but precluded him from acquiring more than 40 percent of the company's stock. In early 2001, Greenblatt used NOLA to continue acquiring HRM's stock in contravention of the standstill agreement. Greenblatt's scheme unraveled in the middle of 2001,

---

[2] The appellee in this case – the United States Trustee – has not provided its own version of the events that led up to the South Beach and NOLA bankruptcy filings. We nonetheless find it useful to summarize Wachovia's version of the facts, because both the Bankruptcy Court in its ruling and the United States Trustee appear to have relied on this account.

2

however, when Ernst & Young resigned as HRM's auditor and NASDAQ halted trading in HRM stock. At this point, Greenblatt started transferring assets among his many shell companies in an effort to avoid creditors. At least six lawsuits have been filed against companies that are affiliated with Greenblatt and were involved in the effort to buy up HRM stock. R. Ex. 11 at 2-8.

On June 6, 2005, South Beach and NOLA requested the bankruptcy court's authorization to retain counsel in these matters. At a status hearing on July 27, 2005, Bankruptcy Judge A. Benjamin Goldgar indicated that this issue was likely irrelevant because he believed that the debtors's bankruptcy petitions were filed in bad faith. The judge made a preliminary ruling dismissing the case but allowed the parties to make written submissions on the issue. R. Ex. B. South Beach asked the court to allow the case to proceed because it was the only way the company could satisfy the claims of its sole creditor; the U.S. Trustee responded that South Beach lacked the ability to reorganize or to liquidate, demonstrating that its bankruptcy filing was simply part of a corporate tax maneuver to resuscitate Greenblatt's financial empire. We note that in its briefs on this issue, South Beach disclosed three assets for the first time: an $8,000 *de minimis* interest in the stock of Movie Star Inc.; a $3,297,489 claim against NOLA that South Beach had already waived; and $3,297,489 in net operating losses (NOLs) related to the purchase of stock in HRM. R. Ex. 6 at 2-3.

On August 24, 2005, the bankruptcy judge dismissed the Chapter 11 petitions of South Beach and NOLA. He characterized the companies as "part of an elaborate network of corporations and other business entities orbiting around Leon Greenblatt, a Chicago businessman." He also described the pending bankruptcy petitions as part of the fallout from Greenblatt's efforts to take over HRM. R. Ex. A. at 4.

The bankruptcy judge ruled that neither bankruptcy petition was filed in good faith. The judge stated that the primary question was "whether the case ha[d] been filed to accomplish one of the two basic purposes of Chapter 11," namely "preserving going concerns" or "maximizing property available to satisfy creditors." R. Ex. A at 9. Because the company had no employees, no business, and no income for over two years, the court held that South Beach's bankruptcy would not preserve a going concern. The question of whether the bankruptcy could maximize property available for creditors, however, was more complicated. South Beach's primary assets were the NOLs, which could be preserved only if the company were sold in a Chapter 11 bankruptcy. 26 U.S.C. §§ 172, 382. The bankruptcy judge acknowledged that the NOLs would have value for whoever purchased South Beach. Under the circumstances, however, the judge expressed the following concern: "[t]he object of the proposed plan here, however, is not to pay third-party creditors at all. The object, as the debtors admit in their response, is to allow Scattered Corporation, yet another Greenblatt entity, and a related corporation, to recover and use the NOLs itself." R. Ex. A at 11. According to the court, the South Beach's bankruptcy would simply allow the debtor itself – not a *bona fide* creditor – to obtain a tax benefit from bankruptcy. For this reason, the court dismissed the petition, holding there was no proper Chapter 11 purpose for South Beach's bankruptcy. R. Ex. A. at 12-13.

## Discussion

The bankruptcy court has wide discretion to dismiss a Chapter 11 petition for cause. 11 U.S.C. § 1112(b). South Beach contends that the bankruptcy court abused its discretion in dismissing its petition for failure to file in good faith. In considering South Beach's appeal, the Court reviews the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear

4

error.  *In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994).

Courts have generally recognized that Chapter 11 bankruptcy petitions are subject to dismissal for failure to file in good faith.  *See, e.g., In re Integrated Telecom Express*, *Inc.*, 384 F.3d 108, 118 (3d Cir. 2004); *In re Marsch,* 36 F.3d 825, 828 (9th Cir. 1994); *see In re Madison Hotel Assocs.*, 749 F.2d 410, 426 (7th Cir. 1984) (differentiating failure to file bankruptcy petition in good faith from failure to file reorganization plan in good faith).  The good faith requirement ensures that a bankruptcy furthers the underlying purposes of Chapter 11 – preserving going concerns and maximizing payments to creditors.  *See In re Integrated Telecom Express*, *Inc.*, 384 F.3d at 119; *In re Original IPFC Shareholders*, 317 B.R. 738, 749 (Bankr. N.D. Ill. 2004); *In re Int'l Oriental Rug Center*, 165 B.R. 436, 442 (Bankr. N.D. Ill. 1994).

Courts have enumerated several non-exclusive factors that are relevant to determining whether a debtor has failed to file a bankruptcy petition in good faith.  Among these factors are whether 1) the debtor has any assets; 2) the debtor has recently transferred assets; 3) the debtor has any employees; 4) the debtor has any cash flow to sustain reorganization; 5) the debtor has any chance of confirming a reorganization plan;  6) the debtor and one of its creditors have reached a standstill in state court litigation; 7) the debtor is trying to delay its creditors or reduce their rights; 8) there are allegations of wrongdoing by the debtor or its principals; or 9) bankruptcy offers the only possibility of preventing the loss of property.  *In re Int'l Oriental Rug Center*, 165 B.R. at 442-43 (collecting factors identified in several cases).  Each bankruptcy petition, however, arises under different circumstances and raises particular concerns, requiring a court to examine the debtor's unique situation to determine where "a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive."  *In re Integrated Telecom*

*Express*, *Inc.*, 384 F.3d at 118 (quoting *In re SGL Carbon Corp*., 200 F.3d 154, 162 (3d Cir. 1999)).

South Beach argues that the court erred in finding that South Beach was improperly attempting to take advantage of a single benefit available only in bankruptcy. Specifically, South Beach contends that the court misapplied *In re Integrated Telecom Express*. In that case, a company whose business plan had failed, but which had few debts and considerable assets, filed a Chapter 11 petition to take advantage of a Bankruptcy Code provision limiting a landlord's recovery in bankruptcy. *Id.* at 112-15. The court held that the company had filed in bad faith because its bankruptcy would not further the underlying purposes of Chapter 11: the company was not in financial distress, its creditors were not at risk of losing their claims, and its bankruptcy was primarily intended to reduce the company's liability for breaking its lease. *Id*. at 129.

South Beach concedes that it filed for bankruptcy to take advantage of section 382(l)(5) of the Internal Revenue Code, which allows companies reorganized in bankruptcy to preserve NOLs upon a change of ownership. South Beach maintains, however, that unlike the company in *Integrated Telecom Express*, it needed bankruptcy protection because it is insolvent and because its creditor cannot recover on its claims outside bankruptcy. We agree that the financial circumstances of South Beach differ from those of the debtor in that case, but this alone does not demonstrate that the bankruptcy court abused its discretion in dismissing South Beach's Chapter 11 petition. The court's decision hinged not only on the fact that South Beach was using bankruptcy proceedings to preserve its sole asset, but also on the fact that it was doing so for the benefit of an "insider" creditor. We therefore turn to that issue.

6

On this point, South Beach contends that it is unclear whether Scattered is an insider, and that even if it were, its claims would be just as legitimate as those of any theoretical third-party creditors. We agree that Scattered is likely an insider vis-à-vis South Beach: the owners of Scattered – including Greenblatt – are the sons of South Beach's owners. *See* 11 U.S.C. § 101(31)(B)(vi) (insiders of a corporate debtor include "relative[s] of a general partner, director, officer, or person in control of the debtor"). There does not, however, appear to be a blanket prohibition on insider creditors collecting on their debts as part of a bankruptcy proceeding – or at least the United States Trustee has cited no such case. Rather, the Bankruptcy Code prevents insiders from using their privileged position to disadvantage non-insider creditors. *See, e.g.,* 11 U.S.C. § 547(B)(4)(b) (allowing trustees to void certain transfers to insiders); 11 U.S.C. § 702(a)(3) (prohibiting insiders from participating in elections for a trustee); 11 U.S.C. § 1129(a)(10) (prohibiting insiders from voting on whether to allow cramdown plan). In this case, however, neither party contends that South Beach has any creditors other than Scattered.

The United States Trustee has not cited, and we have not located, any authority to support the proposition that a bankruptcy court may dismiss a petition based just on the fact that the debtor's only creditor is an insider; it has to make a further finding of bad faith (or some other appropriate basis for dismissal). One basis would be a finding that Scattered had no *bona fide* claim against South Beach. *See In re Coastal Cable TV, Inc.,* 709 F.2d 762 (1st Cir. 1983) (suggesting that a bankruptcy petition is filed in bad faith where there is no real debt). The bankruptcy judge hinted that this was a possibility in discussing the transfer of the $3,297,489 at issue from Scattered to South Beach to NOLA. He states, "Where Scatter[ed] Corporation got the funds has not been explained, nor has any explanation been offered about what legitimate

7

purpose was served by funneling this substantial sum through a series of shell corporations." R. Ex. A at 7-8. The judge did not, however, make a definite finding that South Beach owed no real debt to South Beach.

Nor could the court have done so based on the record that was provided. On a motion to dismiss, the United States Trustee had "the burden of proving by a preponderance of the evidence that cause exists for dismissal of the debtor's bankruptcy case." *In re Woodbrook Assocs.*, 19 F.3d at 318. The United States Trustee's evidence of bad faith consisted of documents concerning corporations other than South Beach.[3] These documents, which are primarily contracts, financial records, and bankruptcy pleadings from other Greenblatt-related corporations, raise the specter of a fraudulent scheme regarding transfers among those corporations, but for the most part, they do not refer to South Beach, its parent corporation NOLA, or its insider creditor Scattered.[4] *See* R. Ex. 12. On the record as it existed, there was not a sufficient basis for the bankruptcy court to find that South Beach had filed its bankruptcy petition in bad faith. There was certainly a basis for concern about the propriety of South Beach's relationship with Scattered and the validity of its debt to Scattered, but more was needed to properly support a finding that there was no *bona fide* claim and that the bankruptcy petition was therefore filed in bad faith.

---

[3] These documents were submitted by Wachovia, one of NOLA's creditors, in support of its motion for appointment of a Chapter 11 trustee in the bankruptcy court. We refer to them here because the bankruptcy court cited them in its decision and the United States Trustee relies on them in its brief in this Court.

[4] There is documentation of a $2,198,326 wire transfer to South Beach from Loop Corporation, a Greenblatt-related entity. It is unclear if and how this transfer relates to this bankruptcy, partly because it does not state the year in which the wire transfer occurred.

Because the bankruptcy court's finding was clearly erroneous on the record as it existed, we reverse and remand the case for further proceedings. The bankruptcy court may revisit the bad faith filing issue if and when the record is supplemented.

The United States Trustee contends in its brief that the record supports other grounds for dismissal. Because these were not the basis for the bankruptcy court's decision, we decline to address them in this appeal. These contentions are, however, available for consideration on remand if the bankruptcy court thinks it appropriate.

## Conclusion

For the reasons stated above, the Court reverses the bankruptcy court's dismissal of the petition and remands for further proceedings.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 6, 2006